AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

## for the

Eastern District of California

**FILED**

JUL 1 8 2018

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. 2: 1 8 - MJ - 1 3 4 — AC |
| | ) |
| Raymond Su | ) |
| | \ |

*Defendant(s)*

# CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ July 17, 2018 _____ in the county of _____ Sacramento _____ in the

_____ Eastern _____ District of _____ California _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1708 | Theft and possession of stolen U.S. Mail |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Roxanne LeMaire, U.S. Postal Inspector
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/17/18

_____
*Judge's signature*

City and state: Sacramento, CA

Allison Claire, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF AN APPLICATION FOR A CRIMINAL COMPLAINT FOR RAYMOND SU | Case No. _____ <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A CRIMINAL COMPLAINT

I, Roxanne LeMaire, being duly sworn, depose and state the following:

1.      I am a United States Postal Inspector.

2.      I make this affidavit in support of a criminal complaint against Raymond Su for violating 18 U.S.C. § 1708, theft and possession of stolen U.S. mail, and request an arrest warrant for Su. Although there is probable cause to believe that Su violated § 1708 on numerous occasions, the complaint charges just one violation: theft and possession of two mail items seized from an airport locker on July 17, 2018.

3.      On July 16, 2018, I served as the affiant for the affidavit attached as Exhibit 1, which is hereby incorporated in its entirety. On the basis of that affidavit, Magistrate Judge Allison Claire signed a criminal complaint and issued arrest warrants for Domingo Ene and Joshua Hopoi for violations of 18 U.S.C. § 1708. Judge Claire also issued search warrants for seven locations associated with Ene, Hopoi, and Su. Although I explained that there was probable cause to believe that Su had violated § 1708 and I requested search warrants on that basis, I did not make a complaint against or request an arrest warrant for Su.

4.      On July 17, 2018, with the assistance of other postal inspectors, I executed the search warrant for the locker at Sacramento International Airport labeled "Raymond Su." Inside the locked locker we found two items of U.S. mail. One was addressed from Madera, CA, to an "Ashley" in Alabama, and the other was addressed from Squaw Valley, CA, to a "Vickie" in Alabama. The locker also contained a wallet with Su's driver's license.

AFFIDAVIT                                                                                                    1

5.    Based on the foregoing, including Exhibit 1, there is probable cause to believe that Raymond Su violated 18 U.S.C. § 1708, theft and possession of stolen mail, on or about July 17, 2018.

6.    Because Judge Claire had already found probable cause that Su violated § 1708 when issuing the search warrants, and based on the evidence in the locker in addition to the evidence already described in Exhibit 1, I made a probable-cause arrest of Su at approximately 1:30 p.m. I am now requesting an arrest warrant on the basis of this complaint.

### REQUEST TO SEAL

7.    This case is the product of a covert investigation. Based on my training and experience in investigations such as this one, I believe that public disclosure of the existence of this affidavit, complaint, and/or arrest warrant may have a significant and negative impact on the continuing investigation. It is respectfully requested that this Court issue an order sealing, until further order of the Court, the affidavit, arrest warrant, complaint, application, and any other supporting papers.

Roxanne LeMaire
U.S. Postal Inspector
United States Postal Inspection Service

Approved as to form.

Miriam R. Hinman
Assistant United States Attorney

Subscribed and sworn to before me this 17 day of July, 2018.

THE HONORABLE ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

# Exhibit 1

## AFFIDAVIT OF POSTAL INSPECTOR ROXANNE LeMAIRE IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANTS

I, Roxanne LeMaire, being duly sworn, depose and state the following.

### PURPOSE

1.     This Affidavit is made in support of applications under Rule 41 of the Federal Rules of Criminal Procedure for warrants to search and seize evidence, fruit, and/or instrumentalities of certain offenses as described in Attachment B, at the following locations as more fully described in Attachment A:

   a.     ▮▮▮▮▮▮▮▮▮, Roseville, California, 95747, as further described in Attachment A-1

   b.     ▮▮▮▮▮▮▮▮▮, Sacramento, California, 95823, as further described in Attachment A-2

   c.     The workroom locker for Joshua Hopoi at Sacramento International Airport, as further described in Attachment A-3

   d.     ▮▮▮▮▮▮▮▮▮, Sacramento, California, 95828, as further described in Attachment A-4

   e.     2007 Blue Toyota Corolla with California license plate ▮▮▮▮▮, as further described in Attachment A-5

   f.     The workroom locker for Raymond Su at Sacramento International Airport, as further described in Attachment A-6

   g.     Raymond Su's person, further described in Attachment A-7.

2.     This Affidavit is also made in support of a criminal complaint and arrest warrants for the following individuals for violations of 18 U.S.C. § 1708, theft and possession of stolen U.S. Mail:

   a.     Domingo ENE (theft and possession of Amazon gift card on or about April 9, 2018)

Affidavit                                                                                          Page 1

b. Joshua HOPOI (theft and possession of greeting cards that were seized from trash on July 9, 2018)

## INTRODUCTION AND AGENT BACKGROUND

3. I am a Postal Inspector and have been so employed since February 2006. Currently, I am assigned to the San Francisco Division of the United States Postal Inspection Service (USPIS), and I work out of the Sacramento office. During my tenure I have completed training at the United States Postal Inspection Service Academy in Potomac, MD. As a part of my official duties, it is my responsibility to investigate violations of federal and state law, including robbery and burglary of postal facilities, destruction of government property, theft of U.S. Mail, possession of stolen U.S. Mail, mail and bank fraud, credit card fraud, identity theft and/or counterfeit personal checks and identifications. As an Inspector with the USPIS, I have participated in investigations relating to theft of U.S. Mail, possession of stolen U.S. Mail, counterfeit corporate checks, counterfeit personal checks, bank fraud, identity theft and counterfeit identifications.

4. The facts and conclusions in this affidavit are based on my personal knowledge gained from my participation in this investigation, my training and experience, and information gained from other Inspectors, Agents, local law enforcement, and field contacts and reports. Since this affidavit is submitted for the limited purpose of obtaining search warrants and a complaint, I have not included all of the facts of which I am aware in this investigation.

5. I believe that there is probable cause to believe that the following individuals:

- DOMINGO ENE (date of birth    ),
- JOSHUA HOPOI (date of birth    ),
- RAYMOND SU (date of birth    ),

have violated or aided and abetted violations of the following federal criminal law: 18 U.S.C. § 1708 (theft and possession of U.S. Mail). Further, I believe that there is probable cause to believe that evidence, fruit, and/or instrumentalities of these violations are currently to be found at the locations in Attachment A.

6.      The USPIS is investigating a criminal scheme that began at a time unknown to the United States but at least starting on or about April 9, 2018, and currently is on-going, wherein perpetrators working for Envoy, a contractor for American Airlines, are stealing U.S. Mail. These perpetrators have access to U.S. Mail that is being delivered from out of state by arriving American Airlines flights that are destined for Sacramento Postal District residences. Additionally, these perpetrators have access to U.S. Mail that is outgoing from Sacramento Postal District and is scheduled for American Airlines flights departing to other states for processing and delivery to customers. Based on my investigation and law enforcement surveillance, the perpetrators appear to be associated with the locations to be searched, as stated below.

7.      Although this affidavit describes probable cause for theft and possession of U.S. mail on numerous occasions between April and July 2018, only the following instances are being charged in the complaint: Domingo Ene is being charged with theft and possession of an Amazon gift card from the mail on or about April 9, 2018. Joshua Hopoi is being charged with theft and possession of the greeting cards found in the trash at ██████████████, Sacramento, CA, on or about July 9, 2018.

## STATEMENT OF PROBABLE CAUSE

8.      On June 1, 2018, I received notification about possible stolen U.S. Mail from the Sacramento Airport post office, which is located in Sacramento County. It appeared that incoming mail from flights that had arrived via American Airlines had been rifled. I contacted Postal Supervisor Moral about the incident and was informed that there are many trays of U.S. Mail that appear to have been rifled through, as the straps to secure

Affidavit                                                        **Page 3**

the tray of U.S. Mail have been broken off from the trays. When a review was conducted of the U.S. Mail in the multiple trays, it appeared the U.S. Mail had been rifled, as it was not in order and together as a normal tray of mail that has been processed.

9.      American Airlines transports some of the U.S. Mail that is mailed from Sacramento (outgoing mail) and U.S. Mail that comes to the Sacramento Postal District (incoming mail). To process the mail, American Airlines contracts with a separate company, Envoy. Envoy employees are responsible for loading mail from the Sacramento Airport Post Office onto American Airlines planes for distribution throughout the United States. They are also responsible for unloading mail from American Airlines planes and delivering it to the Sacramento Airport Post Office so it can be transported to the West Sacramento Plant and Distribution Center for processing and delivery.

10.     I requested that USPIS Sr. Technical Surveillance Specialist Sha place an undercover camera on the dock at the Sacramento Airport Post Office. On June 6, 2018, a camera was installed and on June 22, 2018, a second undercover camera was installed to have a different view of the dock area where mail is worked by the airlines.

11.     On June 5, 2018, USPS Postal Supervisor Moral spoke with two Envoy employees who are contracted via American Airlines to transfer and distribute the mail to and from the airplanes, and who he suspected were possibly stealing U.S. mail because the mail appeared rifled after they left. The two individuals gave their names to Postal Supervisor Moral as "Josh" and "Dom." Postal Supervisor Moral also provided a description of both males as Pacific Islanders.

## Review of Video Surveillance

12.     On June 14, 2018, I began reviewing surveillance video from the Post Office dock. On June 19, 2018, I met with staff of the Airport Security office and provided screen shots of three different unknown males from the USPIS undercover surveillance cameras from June 6 -16, 2018. Dave Rivera from the Airport Security office

Affidavit                                                                    Page **4**

reviewed the pictures of the three unknown males and then reviewed the Envoy badging
pictures that were on file with their system, which was approximately 40-60 employees.
Rivera identified the three individuals as Joshua Hopoi, Domingo Ene, and Raymond Su.
When reviewing video surveillance, I compared the appearance of the people in the video
surveillance to the people in the screen shots that Rivera had identified.

13.      Also, the Airport Security office provided a report of the badge activity for
the post office. Employees are required to use their badge when they leave the post office
and enter the secured area of the Airport tarmac. The office told me that when two
employees are leaving together, they are both supposed to use the badges. However, based
on my review of the badge reports, it appears that when two employees are working
together, usually only one person will use their badge to exit the facility and reenter the
secured area of the tarmac.   The picture that I provided to Airport security for Hopoi was
from June 14, 2018, at approximately 12:09 pm. According to the badge report, the badge
assigned to Hopoi was used to exit from the postal facility to the airport tarmac at 1:00
pm. The picture that I provided to Airport Security for Su was from June 16, 2018, at
approximately 12:29 pm. According to the badge report, the badge assigned to Su was
used to exit the postal facility at 12:35 pm. The picture that I provided to Airport Security
for Ene was from June 8, 2018, at approximately 12:32 am. According to the badge report,
the badge assigned to Ene was used to exit the postal facility at 12:57 am.  I confirmed
that the three individuals in the pictures from the post office had appearances consistent
with the photographs in the badging reports for Hopoi, Ene, and Su.

14.      In the video surveillance, on June 6, 2018 at approximately 7:46 pm,
Joshua Hopoi,[1] appeared to be rifling multiple trays of U.S. Mail. At 8:00 pm, Hopoi
grabbed a shirt from the left side of the baggage cart where he had been rifling U.S. Mail

---

[1] Throughout the video surveillance section of this affidavit, when I refer to Hopoi, Su, or
Ene, I am saying that the person in the video had an appearance consistent with that
individual in the screen shots that Dave Rivera had identified.

and placed his shirt inside the tug (a small vehicle that moves baggage carts from place to place at the airport). Airport badge reports reflect that the badge assigned to Hopoi was used to exit the postal facility at 8:21 pm. On June 6, 2018, Hopoi returned to the Post office around 11:50 pm and walked up to the baggage cart with a sweatshirt in his hand. Hopoi opened the baggage cart and placed the shirt on the floorboard of the cart. Between 12:00 am – 12:02 am on June 7, 2018, Hopoi is seen on good quality surveillance video opening multiple trays of U.S. Mail and stealing multiple pieces. While Hopoi continued to go through different trays of U.S. Mail, he also looked around towards both doors of the Post Office where USPS employees could exit. At 12:02 am, Hopoi grabbed his sweatshirt and placed U.S. Mail inside the shirt. Hopoi then worked a couple of trays of mail, placing them into the Over the Rail containers (OTR), which are used for transportation to the West Sacramento Plant and Distribution Center. Between 12:09 am – 12:14 am, Hopoi again can be seen on surveillance camera opening multiple trays of U.S. Mail and stuffing the mail into his shirt, which is laying on the baggage cart floorboard. At 12:26 am, Hopoi grabbed his shirt containing the stolen U.S. Mail and walked towards the tug to leave the facility. Airport badge reports reflect that the badge assigned to Hopoi was used to exit the facility at 12:41 am.

15.    In the surveillance video, on June 8, 2018 at 1:21 pm, Hopoi took off his sweatshirt and placed it into the baggage cart, and he immediately began to open multiple trays of U.S. Mail. At 1:24 pm, Hopoi stuffed his shirt with stolen U.S. Mail and walked towards the tug to leave the facility. Airport badge reports reflect that the badge assigned to Hopoi was used to exit the facility at 1:34 pm.

16.    In the surveillance video, on June 8, 2018 at 12:32 am, Domingo Ene can be seen on good quality surveillance video walking to the tug with a large stack of what appears to be mail concealed in his safety vest, which he placed inside the tug and then he left the facility.  Airport badge reports reflect that the badge assigned to Ene was used to exit the facility at 12:57 am.  Ene was not captured on camera unloading the mail, because

Affidavit                                                                                      Page **6**

another airline had dropped off mail at the same time and had parked in front of the OTR containers, which is the area that the surveillance camera is fixed on. Multiple airlines transport U.S. Mail, and therefore, there can be several airline or contractor employees at the postal facility at the same time to drop off mail from an arriving flight or to retrieve mail for their outgoing flight.

17.     In the surveillance video, on June 12, 2018 at 8:12 am, Hopoi and Raymond Su were at the postal facility. Hopoi was observed on surveillance images rifling trays of U.S. Mail. At 8:13 am, Hopoi removed his sweatshirt and placed it on the floorboard of the baggage cart. Su continued to work the mail by scanning each tray of U.S. Mail and taking the tray from the baggage cart to the OTR container, and while working the trays of U.S. Mail, he continued to watch the USPS doors for any USPS employees exiting the facility while Hopoi continued to open trays of U.S. Mail. At 8:15 am, a USPS employee walked towards them. Hopoi stopped and sat down on the baggage cart where the shirt and U.S. Mail were, apparently in order to conceal the items, and he began to use his cellular telephone. At 9:00 am through 9:02 am, Su began to open a tray of U.S. Mail on the same side that Hopoi's shirt was located. Su rifled through two trays of mail. Once Su was done looking through the trays of U.S. Mail he threw the trays to the left side of the baggage cart and closed the screens on the cart. Hopoi retrieved his shirt with both hands. Based on the way Hopoi was carrying his shirt, using both arms to hold the shirt and holding it towards his chest, it appears that the shirt was used to conceal the U.S. Mail. Hopoi then placed the shirt in the tug behind the seats. Airport badge reports reflect that the badge assigned to Su was used to exit the facility at 9:03 am. Airport policy is that both parties should use their assigned badge to access the secured area, but there is no record of Hopoi using his badge at this time.

18.     In the surveillance video, on June 14, 2018, Hopoi arrived at the postal facility at 12:02 pm, and at 12:05 pm, he removed his sweatshirt and safety vest and placed them on the roof of the baggage cart. At 12:06 pm, he moved the clothing to the

Affidavit                                                                                   Page 7

baggage cart floorboard. At 12:09 pm, Hopoi looked around to see if any USPS

employees were around and looked at both exit doors to the facility. Hopoi began to open

up multiple trays of U.S. Mail and appeared to stuff stolen U.S. Mail inside of his clothing

items for almost 3 minutes. Between 12:18 pm and 12:25 pm, Hopoi continued to open

multiple trays of U.S. Mail and appeared to stuff the mail into his clothing items, while

looking around for any USPS employees exiting the postal facility doors and coming into

their loading area. At 12:26 pm, Postal Supervisor Samick entered the area and spoke to

Hopoi. On video surveillance, Hopoi can be seen trying to cover his clothing items by

blocking them with his body. Once Samick left to enter the facility with an OTR cart,

Hopoi pushed his clothing items concealing the U.S. Mail to the back of the baggage cart.

Hopoi continued to work the mail. At 12:28 pm, Hopoi grabbed his clothing items with

both hands, continuing to conceal the U.S. Mail, and placed them in the tug on the

passenger side. Hopoi continued to work the mail until his carts were empty. He left the

area and remained off camera until he left the facility. According to the Airport badge

report, he left at 1:00 pm.

19.    In the surveillance video, on June 16, 2018, Hopoi and Su arrived at 12:29

pm. At 12:29 pm, Hopoi opened a baggage cart and immediately began to rifle mail.

Simultaneously, Su grabbed multiple OTR containers and placed them around Hopoi,

which concealed Hopoi from others. Su then walked to the other American Airlines

baggage cart already there, and he assisted the 2 females in unloading their mail from their

baggage carts. Hopoi did not place his first tray of mail into an OTR container until 12:31

pm. Then he continued to appear to rifle the mail until 12:33 pm, when he walked to the

passenger side of the tug with a handful of mail in his left hand and placed them behind

the passenger seat. They left at 12:34 pm. Airport badge reports reflect that the badge

assigned to Su was used to exit the facility at 12:35 pm.

20.    When I say that someone "appears" to be rifling mail in the surveillance

video, I am basing that on the fact that the person will stand in one place for a long period

Affidavit                                                                    Page **8**

of time, often bent over the inside of the baggage cart, and attempt to conceal themselves from other people working in the area. In contrast, when they are actively working the mail, it is a matter of seconds to scan the tray of U.S. Mail, pick it up and move it to the OTR containers or to the baggage cart. In addition, when the video shows them standing in one place and fumbling around, it often also shows them later carrying their sweatshirt with both hands to the tug. It appears the sweatshirt is being used to conceal the items being stolen. Since I see the behaviors that I have described in videos with clear views of mail being rifled and stuffed into items of clothing, I believe that when those same behaviors occur in videos without a clear angle on the mail, it is likely that the individuals are rifling the mail. In this affidavit, I use the word "appears" to distinguish the latter instances from the videos with clear views of the mail being rifled.

21.     In the surveillance video, on June 19, 2018, Hopoi arrived at 8:23 am. At 8:24 am, Hopoi covered himself with an OTR container and was not moving much. He appeared to be rifling mail until 8:46 am, and again from 8:48 - 8:49 am. At 9:16 am, Hopoi retrieved his vest from the baggage cart and placed it inside the tug. At 9:17 am, he walked to the passenger side of the tug and appeared to be fumbling around with the passenger door and concealing the stolen U.S. Mail. Hopoi then walked to the driver side and got inside the tug and put his vest on at 9:18 am. Hopoi appeared to be working with something on the passenger seat and left at 9:19 am. Airport badge reports reflect that the badge assigned to Hopoi was used to exit the facility at 9:19 am.

22.     In the surveillance video, on June 19, 2018, Su arrived at 12:29 pm. Su went off camera multiple times and was out of view. There were multiple straps inside the baggage cart when he was finished with transferring the U.S. Mail from the baggage cart to the OTR container. These straps are intended to help secure the cardboard that is around the tray of mail, so that no mail is lost out of the tray while the mail is being transported. The straps are not supposed to be removed by people in the role that Su, Ene, and Hopoi have. At 12:31 pm, Su grabbed the last tray of mail and was off camera for

Affidavit                                                                              Page 9

almost a full minute. He returned and retrieved the straps from the baggage cart to throw them in the trash can. Su returned to the baggage cart at 12:32 pm, was off camera again for 45 seconds, and left at 12:33 pm. Airport badge reports reflect that the badge assigned to Su was used to exit the facility at 12:34 pm.

23.     In the surveillance video, on June 24, 2018, Su and an unknown male arrived at the postal facility. Between 12:13 – 12:14 pm, Su was inside the OTR container, looking around and appearing to be rifling mail. When he left the OTR container, he had a strap in his hand, which he threw away, and they left.

24.     In the surveillance video, on June 26, 2018, Hopoi and Ene arrived at 6:38 pm. Ene was covered by OTR containers, and Hopoi was to his right working mail and transferring the mail to the OTR containers. At multiple times, Ene stood in one place for long periods of time and appeared to be rifling mail. Hopoi walked over to place a container closer to the post office at 6:55 pm and then walked to another container and began to rifle mail. At 6:56 pm, Hopoi was lifting his shirt and appeared to be placing the mail inside the front of his pants, covered by his shirt, and he walked back toward Ene. At 6:57 pm, Hopoi walked to the passenger side of the tug. However, due to where they were parked, I cannot see what he was doing at the tug. At 6:59 pm, Hopoi walked to the other side of the baggage cart that Ene had been working on. At 7:00 pm , Hopoi can be seen leaving the baggage cart and walking to the tug with a bag or vest in hand. About 15 seconds later, Hopoi returned to Ene and the baggage cart to assist with rolling the containers towards the post facility. They leave the area of the camera at 7:02 pm. Airport badge reports reflect that the badge assigned to Ene was used to exit the facility at 7:14 pm.

25.     In the surveillance video, on June 26, 2018, Hopoi and Ene arrived at 8:12pm. Hopoi had his blue shirt on upon arrival, He took it off at 8:13 pm and placed it on the floor board of the baggage cart. At 8:14 pm, they covered themselves with OTR containers. Ene was to the side and it appears that he was rifling mail until 8:19 pm, when

Affidavit                                                                          Page **10**

he walked to the side of the baggage cart and appeared to be stuffing mail on the side.
Hopoi was standing there on his phone while Ene was going through the mail. At 8:18
pm, Hopoi stood up on the baggage cart to look at the postal facility doors, presumably to
see if anyone was exiting the facility and entering his area.  Hopoi finally began to start
transferring the mail from the baggage carts to the OTR containers at 8:19 pm.  At 8:20
pm, Ene went back to the side and appearred to rifle U.S. Mail. Ene then went out of view.
Due to the concealment of the OTR container, it is difficult to tell when the shirt is
brought to the tug. Airport badge reports reflect that the badge assigned to Ene was used
to exit the facility at 8:46 pm.

26.     In the surveillance video, on June 26, 2018, at 10:24 pm, Hopoi and Ene
were working outgoing mail. Ene reached down inside the side of the baggage cart and
grabbed a grey package in his right hand. Ene walked to the passenger side of the tug and
placed the bag behind the passenger seat.

27.     In the surveillance video, on June 27, 2018, Su arrived at 12:36 pm. Su
appeared to be rifling mail inside the baggage cart multiple times starting at 12:38 – 12:40
pm. Su had parked on the opposite side of the view of the cameras, so I am observing him
on video through the screen of the baggage cart. It appears that he was taking off the
straps from the trays of mail and rifling the U.S. Mail on multiple occasions. It also
appeared that he placed the stolen U.S. Mail under his shirt tucked into his shorts. At
12:41 pm, Su grabbed the straps from the ground and floor board of the baggage cart and
placed them into his pocket. A USPS employee began to walk up. Su pushed the OTR cart
containing the mail towards the employee, and he left at 12:42 pm.

28.     In the surveillance video, on June 27, 2018, Hopoi arrived by himself.  At
11:53 pm, he took off his sweatshirt and safety vest while watching an USPS employee
walk away. Hopoi placed the clothing items inside the baggage cart, on the floorboard to
the right side.  At 12:16 am, he pulled an OTR container towards him to cover him, and
the USPS employee pulled an additional container to him. At 12:17 am, Hopoi removed a

Affidavit                                                                                        Page **11**

tray of U.S. Mail from the OTR container and placed it back into the baggage cart. At
12:18 am, Hopoi looked around, as if to see if anyone was around, and began to open and
go through trays of mail for a minute. Hopoi stuffed the stolen U.S. Mail to the right side
of the baggage cart, where his sweatshirt was placed. Hopoi began to look around again
and appeared to push the sweatshirt towards the back of the cart as a USPS employee
entered the area. At 12:21 am, Hopoi placed another OTR container in front of him, as if
for concealment purposes. Hopoi appeared to open a tray of U.S. Mail, stopped to look for
USPS employees, and then rifled multiple trays of U.S. Mail which were placed in the
OTR container. At 12:22 am, Hopoi placed something on the floorboard of the baggage
cart and returned to the OTR container. Hopoi transferred some trays of mail from one
OTR container to another, looked for USPS employees, and then stole more U.S. Mail,
which he concealed inside of his sweatshirt. At 12:24 am, Hopoi retrieved a tray of mail
from the outside of the baggage cart and placed it inside the baggage cart on the
floorboard. Hopoi again looked for USPS employees. It appeared that he opened that tray
of U.S. Mail and rifled the U.S. Mail for approximately one minute. At 12:25 am, Hopoi
grabbed mail from the OTR container and quickly concealed it in his sweatshirt, which
was placed on the right side of the baggage cart, as a USPS employee walked up. At
12:27 am, the sweatshirt can be seen on the right side of the cart. Hopoi was watching for
USPS employees, and it appears from the video that the area was clear. Hopoi retrieved
his sweatshirt from the baggage cart, held it inside his forearm, walked to the tug, and
placed the items on the passenger side.

      29.    On June 29, 2018, I prepared a test piece of mail, which was a bright
yellow Hallmark greeting card envelope with a P.O. Box address on the outside. Inside the
envelope was a birthday card and a $20.00 gift card to Home Depot. The test piece was
placed underneath multiple trays of mail in an OTR container that was scheduled to be
picked up for an American Airlines flight leaving on June 30, 2018, at 12:40 am. In the
surveillance video, Ene arrived to transfer the U.S. Mail from the postal facility to the

Affidavit                                                                  Page **12**

baggage carts for the flight. On video, I observed Ene reach down and appear to grab an item. When Ene stood up, he looked around for any USPS employees in the area. Ene had the item in his left hand and placed it in his left pocket of his shorts. On video, I observed the item to be a bright yellow envelope. The yellow envelope never arrived at the address on the envelope. I have not yet learned from Home Depot whether the gift card has been used.

## Other Investigative Steps and Evidence

30.     On June 19, 2018, Inspector Jennifer Hiland and I met with Sacramento Sheriff's Department at the airport and informed them about the investigation. On the same day, we met with Sacramento Airport Manager of Security, Badging and Communications Center, Joe Conklin, and advised him of the investigation. Due to the investigation, it was approved by Sacramento Sheriff's Department and Airport Security that USPIS personnel would gain Sacramento Airport access badges to continue the investigation.

31.     The Airport Security and Badging office provided copies of the Security Badge Application for Domingo Ene, Joshua, Hopoi, and Raymond Su. Those applications included California driver's license numbers and addresses. Ene's address was listed as ▮▮▮▮▮▮▮▮▮▮▮▮▮, Roseville, CA 95747. Su's address was listed as ▮▮▮▮▮▮▮▮▮▮▮▮▮, Sacramento, CA 95825. Hopoi's address was listed as address, ▮▮▮▮▮▮▮▮▮▮▮, Rocklin, CA. However, through postal records from the Rocklin Post Office, I learned that the ▮▮▮▮▮▮▮▮▮ address was vacant. A records check was conducted using CLEAR, a law enforcement database used to locate addresses of individuals. A ▮▮▮▮▮ Hopoi was associated with ▮▮▮▮▮▮▮▮ but the records also showed that ▮▮▮▮ Hopoi had ▮▮▮▮▮▮, Penryn, CA and a new address of ▮▮▮ ▮▮▮▮▮▮▮▮, Sacramento, CA. A records check with the Penryn, CA Post Office on ▮▮▮▮▮▮▮, Penryn, CA reflected that Josh Hopoi was also listed as eligible to receive

mail at this PO Box. The local post office that delivers to ███████████████████,
Sacramento, CA, confirmed that the last name receiving mail is Hopoi. As described
below, surveillance was also conducted on Hopoi on July 2, 2018, and law enforcement
followed him to his new address, ██████████████, Sacramento, CA.

32.     On June 21, 2018, I prepared a test piece of mail, which was a white
envelope that contained a Hallmark greeting card with a P.O. Box address on the outside.
Inside the envelope was a graduation card and a $20.00 gift card to Walmart, gift card
number "█████ 2726." The test piece was placed underneath multiple trays of mail in
an OTR container that was scheduled to be picked up for an American Airlines flight later
that evening. Based on surveillance video, it was difficult to tell if the card was stolen.
However, Postal Supervisor Moral searched the area after the Envoy employees left the
facility, and he could not locate the envelope. It was also not turned in to postal
management. It has not arrived at the address listed on the envelope. On July 8, 2018, I
obtained information from Walmart Loss Prevention that the gift card that I had placed in
the white test piece on June 21, 2018, was used on June 27, 2018. Walmart loss
prevention provided a copy of the Walmart receipt, showing gift card number "█████
2726" was used at the Walmart located at 30600 Dyer Street, Union City, CA 94587. A
surveillance camera exit photograph was provided by Walmart Loss Prevention, and the
appearance of the person leaving the store is consistent with Domingo Ene.

33.     On June 25, 2018, I spoke with Postal Office of Inspector General Special
Agent (SA) Warner about the case (Postal OIG conducts employee theft investigations).
SA Warner stated he had received a mail theft complaint dated April 9, 2018, from a
victim in Illinois who had mailed a greeting card to Redding, CA. When the card and
envelope was received, the envelope was ripped in half and the gift card was missing.
Victim R.F. stated that he had mailed a card and that the contents of the card did not arrive
with the card upon delivery. The victim reported the card contained a $50.00 Amazon gift
card. The recipient of the card provided the gift card receipt, which was delivered with the

Affidavit                                                                Page **14**

card. Based on the receipt information, Walgreens provided the Amazon gift card number. SA Warner subpoenaed Amazon for the records of the Amazon gift card.

34.     Amazon provided the subpoenaed information on June 20, 2018, to SA Warner. Amazon records reflect that victim R.F.'s Amazon gift card for $50.00 was registered to Domingo Ene's personal Amazon account. Ene's personal email address registered to his Amazon account is ████████████. This email address (████████████) is also listed on Ene's Airport Security Badge Application. Amazon records indicate the address for Ene is 1722 Grey Bunny Drive, Roseville, CA 95747. Amazon provided information related to the purchase using the gift card. The purchase was jewelry listed as LoveBling 10K Yellow Gold 2mm 28" Diamond Cut Rope Chain Necklace with Lobster Lock, which cost $155.00. Amazon records reflect the purchase was conducted on May 10, 2018, and was shipped via USPS Priority Mail with tracking number 9310 8201 1140 2692 3918 66. USPS records indicate that Ene received an Amazon package at ████████████ Roseville, CA 95747 on May 12, 2018, with tracking number 9310 1140 2692 3918 66. Additional Amazon records indicate there have been 14 gift cards registered to Ene's Amazon account since August 9, 2017, for a total of $620.00. Envoy employment records indicate that Ene started work at Sacramento Airport on June 2, 2017. These 14 gift cards fall within his dates of employment.

35.     Envoy employment records indicate that Su started work at Sacramento Airport on February 10, 2017.

36.     On July 2, 2018, Postal Inspectors La'Keisha Abram and I, and Placer County TFO Noah Brommeland conducted surveillance at the Sacramento Airport. I confirmed with Sacramento Airport Badging and Security personnel that both Hopoi and Su were currently working. According to their work schedule, they were scheduled to work until 1:30 pm. I observed Hopoi and Su leave their security area behind the ticket counter and leave through the door between the Delta and United Airlines ticket counters.

Hopoi was wearing dark shorts and a long sleeve blue shirt, which he has been seen wearing on video. Hopoi also had a black backpack, which he was carrying over his left shoulder. Su was wearing dark shorts and a grey t-shirt, and he carried a black backpack over both shoulders. They both exited the terminal and walked to employee parking lot 51. TFO Brommeland observed them walking into the parking lot, and Inspector Abram observed them leave in a blue Toyota Corolla, CA license plate ████████. Su was observed as the driver and Hopoi was observed in the passenger seat. At approximately 1:39 pm, law enforcement observed them leaving the parking lot, and we followed the vehicle to ███████████, Sacramento, CA. As stated above, USPS records had previously indicated that this was the address for Hopoi. At approximately 2:10 pm, law enforcement observed Hopoi exit the passenger side of the vehicle with his backpack and walk into the residence. I know from my training and experience that people who steal U.S. Mail will generally take the mail into their residence so they can open, review, and catalog their gains in the privacy of their own residence. Also, through my training and experience, I know that people who steal U.S. Mail will often use the stolen goods to make purchases online using the stolen gift cards and/or credit cards.

37.     After Hopoi was dropped off at his residence, law enforcement entered the known residence of Su into their GPS system and learned the residence was within a few miles of Hopoi's residence.  Law enforcement followed the vehicle to ██████████ ████, Sacramento, CA and observed the garage door open. At approximately 2:20 pm, the vehicle driven by Su was parked on the left side of the driveway, and law enforcement observed Su exit the driver side of the vehicle with his backpack and enter the residence. This address is the same address listed on Su's Security Badge Application and was also verified by USPS address verification with his local delivery post office.

38.     On July 9, 2018, law enforcement conducted a "trash run" at ███████ ███████, Sacramento, CA, which is known to be Hopoi's address, as described above. Their house numbers are located on the right side by the garage door. The residence had 3

Affidavit                                                                        Page **16**

trash receptacles, which were located outside their residence on the street, just to the left of their driveway. One receptacle was for trash, one receptacle for recycle, and one receptacle for green waste.   A review of the trash located two different gray plastic bags. Each bag contained over 50 greeting cards and envelopes, addressed to people throughout the nation, for a total of approximately 113 greeting cards. All the envelopes obtained via the "trash run" were already opened and contents rifled. There were multiple envelopes that contained checks and money orders, which were thrown away with the contents. The check amounts included $25.00, $30.00, $40.00, $50.00, $100.00, $1000.00, and $3216.00. There was a cashier's check for $1,500.00 and a Western Union money order for $80.00.

39.     On July 11, 2018, law enforcement conducted a "trash run" at ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮, Sacramento, CA, which is known to be Su's address, as described above. Their house numbers are located on the right side of the garage door. The residence had 2 trash receptacles, which were located outside their residence on the street curbside. One receptacle was for trash, and the other receptacle was for recycling. A review of the trash located 10 gift cards or backings of gift cards. With one possible exception, the names written on the gift cards or backings of gift cards do not match the names of persons receiving mail at this address. According to postal records and a check in CLEAR, a law enforcement database, names associated with the address are ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The names listed on the gift cards and gift card backings were Kalea, Marti from Pat, Paige from Duane and Shaun, David from Maura, Mart from Sue and David, Karen, Allison from Bailey, and Ryan.  There was one Starbucks gift card that was listed as to "Ray-Ray" from Carole and Derek, so based on the name alone, it is possible that card was actually given to Raymond Su.  Additionally, there were three register receipts, which show that gift cards were used on all three purchases. Specifically, there was a Visa Debit gift card ending 4517 used at a Disney store located at 1689 Arden Way, Sacramento, CA, dated June 28, 2018.  This Visa Debit

Affidavit                                                                                        Page **17**

card was also located in the trash and has the name "Kalea" and "$40" written on the top of the card. Additionally, there is a Macy's receipt, dated June 28, 2018, which reflects a Macy's gift card in the amount of $50.00 was used, and a Home Depot receipt dated May 26, 2018, which reflects a gift card in the amount of $50.00 was used. Additionally, there was U.S. Mail in the name of Raymond Su from American Express for a credit card offer and Pep Boys. There was also torn UPS packing information for Su from Eastbay, which is an online company for footwear and apparel.

40.     Through my training and experience, and discussing the case with other law enforcement officials, I know that mail thieves need a place to hide the items that were stolen so they can review them at a later time in private. Both Hopoi and Su have been observed by law enforcement to carry backpacks when they start their shift and when they end their shift. Since Hopoi and Su enter the postal facility multiple times during their shifts, and it appears there are multiple thefts during the day, they would need to conceal the stolen U.S. Mail until the end of their shifts. The Envoy employees have a private room that is considered their break room and locker room. Both Hopoi and Su have lockers that are assigned to them, and the lockers are to be used to store their personal belongings (including backpacks) while they are working their shift at the airport.

41.     According to an Envoy manager, the Envoy locker room is located in Terminal A, on the ground floor. The locker room contains bays of lockers on three walls. On the right side of the locker room, there is a bay of tan lockers which contains 18 lockers. The bay of lockers on the right side has three rows of lockers and each row has six lockers. Josh Hopoi's locker is in the second row and is listed with a sticker that says "Joshua". His locker is the fourth locker from the right side.

42.     According to the Envoy manager, on the left side of the locker room, there is a bay of tan lockers which contain 9 lockers. The bay of lockers on the left side has three rows of lockers and each row has three lockers. Raymond Su's locker is in the

Affidavit                                                                    Page **18**

second row and his locker is the third locker from the right side. His locker has multiple stickers on it and has a blue piece of paper with a sticker that says "Mine". Su's locker has a black and silver pad lock on it and a white piece of paper that reads Raymond Su.

43.     Ene was fired from his employment with Envoy on July 4, 2018, because of time and attendance issues.

44.     Based upon my training and experience in mail theft investigations, I know that suspects often take the stolen U.S. Mail they obtained illegally to their residences so they can open the U.S. Mail in private, and will store the contents in their residences, and especially their bedroom or offices until ready to use.

## COMPARABILITY WITH PRIOR INVESTIGATIONS AND EXPERIENCE

45.     Based upon my training and experience, my conversations with other law enforcement personnel assisting in this case, and my investigation in this case, I am aware that persons involved in mail theft, along with their conspirators/accomplices, use mobile cell phones, tablets, and computer laptops to communicate with one another, either by voice calls, emails, and/or text messages regarding their fraud and theft activities. I know that perpetrators who use such devices commonly exchange real time information about theft and fraud activity and other information regarding execution of theft or fraudulent transactions. Such information can be found stored in the text/email messages and images on such devices. Such persons also use the devices to link with the internet to obtain addresses and maps and locations/addresses of victims. Such devices can also be used to remotely make online fraudulent purchases. Such devices can also be used to perform false or fraudulent mobile banking operations and checks (verifications).

46.     Based upon my training and experience, my conversations with other law enforcement personnel assisting in this case, and my investigation in this case, I am aware that the complete contents of text messages, image files, and emails may be important to establishing the actual user who has dominion and control of a particular phone or computer at a given time. Cell phones may be subscribed to under false names with little

Affidavit                                                                                               Page **19**

to no verification by the service provider. Cell phones and computers may also be used by multiple people. Given the ease with which such items may be obtained and used, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of a particular cell phone or device that was used to send a particular text or email message, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular cell phone or device. Often, by piecing together information contained in the contents of the device (cell phone or computer or storage device) an investigator can establish the identity of the actual user. Often, those pieces will come from a time period before the device was used in criminal activity. Limiting the scope of the search for information showing the actual user of the device would, in some instances, prevent the government from identifying the user of the device and, in other instances, allow a defendant to possibly suggest that someone else was responsible. Therefore, the entire content of a communication device often provides important evidence regarding the actual user's dominion and control of the device. Moreover, review of the contents of communications of electronic storage devices, including text and email messages sent or received by the subject device, assist in determining whether other individuals had access to the device.

47.     Based upon my training and experience, my conversations with other law enforcement personnel assisting in this case, and my investigation in this case, I am aware that criminals discussing their criminal activity via electronic communication devices (email and text messaging) may use images, slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or code words (which require entire strings or series of text message conversations to determine their true meaning) when discussing their crimes. They can also discuss aspects of the crime without specifically mentioning the crime involved. It is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a text message or the manipulation and combination of keys on the computer keyboard to

Affidavit                                                                                         Page **20**

convey an idea, such as the use of a colon and paren :) to convey a smile or agreement) to discuss matters. "Keyword searches" or other automated methods of review of the text messages sent to and from the subject device would not account for any of these possibilities, so actual review of the text and email messages by law enforcement personnel with information regarding the identified criminal activity is necessary to find all relevant evidence.

48.   Based upon my training and experience, my conversations with other law enforcement personnel assisting in this case, and my investigation in this case, I have learned the following additional information:

(a)   Individuals who steal, misdirect, take, unlawfully possess, or by fraud or deception obtain, U.S. Mail often maintain the U.S. Mail, and its contents, including gift cards, for long periods of time to exceed months. Such individuals will also scan onto computers, cell phones, and computer storage devices stolen mail or fraudulently obtained mail (and its contents) and maintain on computers, cell phones, and storage devices co-conspirators names, victim's names, addresses (of victims, associates, accomplices), and stolen means of identification, to include images of such, thereby reducing such items' exposure to law enforcement and the community. Individuals use their cell phones and personal computers to make online purchases using gift cards to order items that will be shipped to their residences.

(b)   I am aware that even if a perpetrator deletes evidence of criminal activity (such as identity theft, and fraudulent use of financial information in U.S. Mail) from electronic storage devices, the evidence often can be recovered from the devices, including computers or other forms of electronic storage media.

49.   Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

Affidavit                                                                    Page **21**

50.     There is probable cause to believe that things that were once stored on any electronic devices located at the locations enumerated in Attachment A may still be stored there, for at least the following reasons:

(a)     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

(b)     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space-that is, in space on the storage medium that is not currently being used by an active file-for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

(c)     Wholly apart from user-generated files, computer storage media-in particular, computers' internal hard drives-contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

(d)     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

51.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how electronic devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the electronic devices found because:

(a)     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

(b)     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

(c)     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

(d)     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and

Affidavit                                                                                                      Page 23

passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

(e)     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

(f)     I know that when an individual uses an electronic device, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

52.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

(a) *The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

(b) *Technical requirements.* Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

(c) *Variety of forms of electronic media.* Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

53.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of electronic devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a device to human inspection in order to determine whether it is evidence described by the warrant.

54.    *Manner of execution.* Because this portion of the warrant—seeking forensic examination of electronic devices found—seeks only permission to examine device(s) that would be already in law enforcement's possession, the execution of the forensic examination would not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of such examination at any time in the day or night following the seizure of the device.

55.    Because several people share the addresses listed in Attachment A as a residence, it is possible that the locations will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is probable that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

56.    For the reasons stated above, there is probable cause to believe that DOMINGO ENE, JOSHUA HOPOI, and RAYMOND SU committed one or more violations of 18 U.S.C. § 1708, and that evidence, fruits, contraband, and instrumentalities of these violations, as more fully described in Attachment B, hereby fully incorporated herein, may be found at the locations identified in Attachment A, attached and fully incorporated herein.

## REQUEST TO SEAL

57.    This case is the product of a covert investigation. Based on my training and experience in investigations such as this one, I believe that public disclosure of the existence of this affidavit, complaint, arrest warrants and/or search warrants may have a significant and negative impact on the continuing investigation and may severely jeopardize law enforcement efforts to execute the warrants. Also, premature disclosure

may pose a risk to executing law enforcement. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this affidavit, the accompanying search warrant, and application.

Roxanne LeMaire
U.S. Postal Inspector
United States Postal Inspection Service

Approved as to form.

Miriam R. Hinman
Assistant United States Attorney

Subscribed and sworn to before me this $16$ day of July, 2018.

THE HONORABLE ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-1**

The residence of ███████████████, Roseville, CA is described as follows:
The residence is a 2 story house with the numbers listed to the left of the 2 car garage. The
numbers are listed in black with a white background. The house is grey stucco with white
trim and rock trim.



## ATTACHMENT A-2

The residence of ▮▮▮▮▮▮▮▮▮▮▮ Sacramento, CA is described as follows:
The residence is a single story house with the numbers listed to the right of the 2 car
garage. The numbers are listed in black. The house is tan stucco with brown trim. The
garage door is white and is missing the top panel. There is a black security screen door,
which opens to the left side. The front windows contain black rod iron security bars.



## ATTACHMENT A-3

The locker described as follows: Inside the Envoy locker room at Sacramento International Airport, which is located in terminal A, on the ground floor, their locker room contains bays of lockers on three walls. On the right side of the locker room, there is a bay of tan lockers, which contains 18 lockers. The bay of lockers on the right side has three rows of lockers and each row has six lockers. Josh Hopoi's locker is in the second row and is listed with a sticker that says "Joshua." His locker is the fourth locker from the right side.



## ATTACHMENT A-4

The residence of ████████████████, Sacramento, CA is described as follows:
The residence is a single story house with the numbers listed to the right of the 2 car
garage, which is tan in color. The numbers are listed in black with a white background.
The house is tan panels with off white trim and a shingle room. The front door has a tan
security screen door which opens to the left.



## ATTACHMENT A-5

2007 Blue Toyota Corolla with California license plate ███████ registered to ███████
█ at ██████████, Sacramento, CA.



## ATTACHMENT A-6

The locker described as follows: Inside the Envoy locker room at Sacramento International Airport, which is located in terminal A, on the ground floor, their locker room contains bays of lockers on three walls. On the left side of the locker room, there is a bay of tan lockers which contains 9 lockers. The bay of lockers on the left side has three rows of lockers and each row has three lockers. Raymond Su's locker is in the second row and his locker is the third locker from the right side. His locker has multiple stickers on it and has a blue piece of paper with a sticker that says "Mine." Su's locker has a black and silver pad lock on it and a white piece of paper that reads Raymond Su.



**ATTACHMENT A-7**

Raymond SU is an Asian male adult, approximately 5'6", with black hair and brown eyes. His date of birth is ▇▇▇▇▇▇▇▇. His photograph appears below.

The search of SU shall include his person, clothing, and personal belongings, including backpacks, briefcases and bags, that are within his immediate vicinity and control at the location where the search warrant is executed and that may contain the items called for by Attachment B to this warrant.



## ATTACHMENT B

The evidence to be searched for and seized concerns violations of Title 18, United States Code, Section 1708 (theft and possession of stolen U.S. Mail), between February 2017 and the present, in whatever form, whether physical, digital, electronic, or otherwise, and is described in the enumerated list below.

1. Items and information tending to identify persons exercising dominion and control over the location or particular areas within the location, including correspondence, papers, photos, videos, bank statements, credit card statements, receipts, utility bills, emails, internet transaction records, parcels, mail, and clothing.

2. United States mail, identification documents, greeting cards, and access devices bearing the names of, or otherwise tending to pertain to, persons who do not live at or control the location.

3. Documents, records, and information relating to the contents of mail or property in the names of persons who do not live at or control the location, together with indicia of the possession, control, ownership or use of such mail or property.

4. Gift cards and documents, records, and information pertaining to the possession, control, ownership, or use of gift cards, including items obtained through transactions involving gift cards.

5. Documents, records, and information tending to show how money associated with the theft or possession of U.S. Mail was obtained, secreted, transferred, and/or spent, including online purchases and electronic transfers of funds.

6. Records and information related to e-mail or other online accounts associated with transactions involving gift cards, including the email account ▮▮▮▮▮▮▮▮▮▮ and the Amazon account identified by that email address.

7. Communications between Domingo Ene, Joshua Hopoi, and/or Raymond Su that pertain to mail, gift cards, theft, or items stolen from the mail, or that tend to show a conspiracy or agreement.

8. With respect to "digital devices" (defined below), in addition to all of the categories described in the preceding Paragraphs 1 through 13 above, items and information to be seized include any electronic records, including e-mail messages, text messages, videos, electronic documents, images, and/or data:

    a. tending to identify persons exercising dominion and control over each digital device searched;

    b. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of any electronic information responsive to Paragraphs 1 through 13 above.

    "Digital devices" means computers, computer tablets (e.g., iPads), electronic storage devices (e.g., hard drives, thumb drives), and mobile phones. The seizure

and search of digital devices shall follow the procedures outlined in the supporting affidavit. Deleted data, remnant data, slack space, and temporary and permanent files on the digital devices may be searched for the evidence above.